# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Dorothy V.,

        Plaintiff,

    v.

Andrew Saul, Commissioner of Social
Security

        Defendant.

Case No. 18-cv-2410 (ECW)

**ORDER**

---

This matter is before the Court on Plaintiff Dorothy V.'s ("Plaintiff") Motion for

Summary Judgment (Dkt. 14) ("Motion") and Defendant Commissioner of Social

Security Andrew Saul's ("Defendant") Cross Motion for Summary Judgment (Dkt. 17)

("Cross Motion").  Plaintiff filed this case seeking judicial review of a final decision by

Defendant denying his application for disability insurance benefits.  For the reasons

stated below, Plaintiff's Motion is denied, and Defendant's Cross Motion is granted.

## I.    BACKGROUND

Plaintiff filed an application for Disability Insurance Benefits on June 24, 2015,

alleging disability beginning September 19, 2012.  (R. 158.)[1]  Her application was denied

initially (R. 82) and on reconsideration (R. 94).  Plaintiff requested a hearing before an

ALJ, which was held on September 20, 2017 before ALJ Peter Kimball.  (R. 10.)  The

ALJ issued an unfavorable decision on October 17, 2017.  (R. 7.)  Following the five-step

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. 13.

sequential evaluation process under 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since September 19, 2012, the alleged onset date. (R. 12.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: chronic fatigue syndrome, fibromyalgia, vertigo, and Raynaud's syndrome. (R. 12.) The ALJ determined that Plaintiff's other physical impairments were not severe, including headaches, restless leg syndrome, hypertension, history of rheumatoid arthritis, tremors, insomnia, chronic right knee pain, and cervical degenerative disc disease. (R. 12.) The ALJ noted that each of these impairments were not severe, as the evidence and testimony establish that they result in at most mild work-related limitations. (R. 12-13.)

At the third step, the ALJ determined that Plaintiff does not have an impairment that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13-14.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) with lifting, carrying, pushing and pulling twenty pounds occasionally and ten pounds frequently, standing six hours, walking six hours and sitting six hours in an eight hour work day, except no more than occasional climbing of ramps and stairs, no more than occasional balance, stoop, kneel, crouch and crawl, never climb ladders, ropes or scaffolds, no work with exposure to unprotected heights or moving mechanical parts, no work in humidity and wetness, and no work in extreme cold or heat.

(R. 14.)  Based on this RFC, the ALJ determined that Plaintiff is capable of past relevant work as a child care worker, which the vocational expert ("VE") testified a hypothetical individual with the determined RFC could perform.  (R. 18-19.)

Alternatively, at step five, the ALJ asked the VE what other jobs a hypothetical person with Plaintiff's RFC, age, education, and work experience could perform in the national economy.  (R. 28.)  Given all the factors, the VE testified that such an individual could perform jobs such as mail clerk and assembler, plastic hospital products, which exist in significant numbers in the national economy.  (R. 19.)  Accordingly, the ALJ found Plaintiff not disabled.  (R. 19.)

Plaintiff requested review of the decision.  (R. 1.)  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1.)  Plaintiff then commenced this action for judicial review.  The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RECORD

On October 9, 2012, Plaintiff saw Shaun Dekutoski, M.D. regarding a "flutter sensation" in her chest that occurred 1-2 times a month.  (R. 329.)  At the time, Plaintiff was taking Dexedrine and Xyrem to help her sleep, and tramadol[2] for restless leg

---

[2]    Tramadol is "[a]n analgesic drug with a mechanism of action that is unusual in that one optic isomer exerts typical opioid-type effects and the other isomer interacts with

syndrome.  (R. 329-30.)  At the visit, Plaintiff stated that her pain was 9 out of 10 for restless leg syndrome, but she was asymptomatic at the visit.  (R. 330.)  Dr. Dekutoski did not make any medication changes and recommended a 30-day heart monitor if her palpitations continued.  (R. 330.)

Plaintiff saw Dr. Dekutoski again on November 1, 2012 due to spells of lightheadedness.  (R. 324.)  Dr. Dekutoski recounted the following issues from Plaintiff:

> Now, she returns and brings in an extensive diary of symptoms.   On 10/13/2012, she states she was under a lot of stress and suddenly felt a headache and a flushed feeling and then a few palpitations.  She states she did get some right shoulder pain at that time but mainly noticed her headache and a sparkling sensation in her eye and felt that her vision was blurred bilaterally.  She thinks she may have blacked out.
>
> Then, on 10/28 /2012, she was up on a chair reaching to get a vase when she suddenly felt a cold rush in her face.  She also felt extremely nauseous and lightheaded and had a headache that was 8 out of 10 and fuzzy vision in her left eye.  This time, the symptoms lasted for 1-1/2 to 2 hours before resolving.  She did not have any associated palpitations with this episode.  It has not recurred since that time, and she currently is asymptomatic.
>
> She does continue to have nocturnal leg pain which she describes as 7 out of 10, but this has been longstanding and has not changed.
>
> She denies any chest pain, shortness of breath, easy fatigability, orthopnea or leg swelling.
>
> She also recently was lifting a picture frame and the glass broke, and a shard of glass fell and punctured the top of her right foot on approximately 10/18/2012 while at home.  She washed the wounds with soap and water, but has noticed it is increasingly painful since that time. She did pull out the shard of glass and has not felt that there is any foreign body still remaining. She had a tetanus vaccine that is currently up to date.

---

the reuptake and/or release of norepinephrine and serotonin in nerve terminals." STEDMAN'S MEDICAL DICTIONARY, 2014 (28th ed. 2006).

(R. 324.)  Dr. Dekutoski gave Plaintiff medication for the foot injury and ordered an MRI of her head because of the reported black out.  (R. 325-26.)

On December 5, 2012, Plaintiff saw Angela Borders-Robinson, D.O. for a consultation regarding the headaches she described to Dr. Dekutoski.  (R. 320.)  Dr. Borders-Robinson noted that Plaintiff had an MRI of her brain with and without contrast, and that they "both are essentially normal."  (R. 320.)  Dr. Borders-Robinson reported that the headaches may be recurrent due to perimenopause and that if the headaches become more persistent or recur, she should return.  (R. 322.)  Otherwise, Dr. Borders-Robinson did not alter Plaintiff's care.  (R. 322.)

Plaintiff saw Dr. Dekutoski again on January 9, 2013 on a follow-up for hypertension and for the right foot injury.  (R. 318.)  Regarding hypertension, Dr. Dekutoski restarted medication that had worked previously (R. 319), and regarding the right foot pain, Dr. Dekutoski ordered an MRI because Plaintiff reported she "has exquisite sensitivity to touch if anything touches the distal tips of her toes and also has pain with weightbearing."  (R. 318-19.)  Plaintiff did not report other symptoms or distress at the visit.  (R. 319.)

Plaintiff saw a podiatrist on January 29, 2013 for the right foot pain, at which time she received injection therapy with a plan for follow up.  (R. 315-16.)  At the follow up on February 20, 2013, Plaintiff reported improvement in the right foot pain "down to a 0 on a 1-10 scale."  (R. 312.)  Plaintiff also noted right ankle pain, which was treated with a support brace and stretching and strengthening.  (R. 312.)

On April 15, 2013, Plaintiff saw Dr. Dekutoski for preoperative clearance for elective surgery. (R. 308.) Plaintiff had "no recent illness or complaints or concerns" and was medically cleared for surgery. (R. 308-10.)

Plaintiff saw Dr. Dekutoski next on May 29, 2013 regarding restless leg syndrome. (R. 304.) Plaintiff stated her restless leg syndrome "is getting more severe and 9 out of 10 where it really interferes with her day-to-day life." (R. 304.) "She feels that she has pain all the way from her hips down to her ankles," but it "is not worse with weightbearing." (R. 304.) Dr. Dekutoski noted in his exam that her "[b]ilateral hips, knees and ankles show full nontender range of motion" and her "[m]uscle strength [was] symmetrical and intact to resistance in bilateral lower extremities." (R. 305.) "Reflexes symmetrical in the bilateral lower extremities." (R. 305.) Dr. Dekutoski prescribed a trial of 10 mg oxycodone for nighttime use. (R. 305.)

Plaintiff returned on July 25, 2013 to Dr. Dekutoski because "she has for the past 3 weeks had extreme pain in the bilateral shins and bilateral knees and hips and arms, including forearms." (R. 302.) Plaintiff reported that "that those seem to be pain in her joints as well as in the muscles." (R. 302.) Plaintiff also reported that within the previous three weeks she began having a prickly skin feeling all over. (R. 302.) Dr. Dekutoski ordered various tests and continued her course of treatment until results from the tests were received. (R. 303.)

On August 28, 2013, Plaintiff saw Kathryn Khouri, D.O. about "ongoing body pain for several years." (R. 299.) Plaintiff described debilitating pain and feeling like bugs are crawling on her skin when nothing is there. (R. 299.) Plaintiff told Dr. Khouri

that her symptoms were worsening and that the body pains were worse with weather changes. (R. 299.) Plaintiff also told Dr. Khouri that she has taken Oxycontin, which worked well overnight so she could sleep, but then the pain returns in the morning and lasts all day. (R. 299.) In addition, Plaintiff was taking tramadol, 2 tablets every 4 to 6 hours as needed for pain, with a maximum of 8 tabs per 24 hours. (R. 299.) Plaintiff was negative in all her lab work "for connective tissue disease, and other immunologic causes." (R. 299.) Dr. Khouri reported she thought it was multiple sclerosis versus fibromyalgia versus something else. (R. 300.) Dr. Khouri discussed the addictive properties of oxycontin with Plaintiff and they agreed that Plaintiff would soon stop taking it. (R. 300.)

On September 18, 2013, Plaintiff saw Dr. Borders-Robinson, whom Plaintiff had seen before for migraine headaches. (R. 296.) Plaintiff told Dr. Borders-Robinson that she is having generalized pain. (R. 296.) Plaintiff told Dr. Borders-Robinson that "[h]er entire body hurts, arms, legs, mainly in the muscles with minimal joint pain." (R. 296.) "Symptoms seem to be worse with movement, but it is causing difficulty sleeping. It is causing her difficulty being active. She is not currently working." (R. 296.) Plaintiff also told Dr. Borders-Robinson that "she also has paresthesias[3] where she can feel like bugs are crawling on her skin or her hair is standing up on her skin which also is very disturbing to her." (R. 296.) Plaintiff rated her pain as 10 out of 10 because of pain all

---

[3]   Paresthesia is "[a] spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems." STEDMAN'S MEDICAL DICTIONARY, 1425 (28th ed. 2006).

over.  (R. 297.)  Plaintiff had a routine noncontrast MRI of her cervical spine taken.  (R. 263.)  David S. Morrell, M.D. noted mild degenerative disc disease at C6-C7 with mild bilateral foraminal narrowing due to small right lateral disc protrusion and small left lateral disc extrusion.  (R. 263-64.)

On October 7, 2013, Plaintiff saw Dr. Borders-Robinson to discuss Plaintiff's migraine headaches and generalized pain and paresthesia.  (R. 293-94.)  Dr. Borders-Robinson noted that "[t]here is some joint pain, but predominantly it is muscular pain."  (R. 293.)  Dr. Borders-Robinson noted that Plaintiff's metabolic workup was normal and the cervical spine MRI ruled out "any type of spinal cord abnormalities."  (R. 293.)  Dr. Borders-Robinson discussed with Plaintiff that "she really fits more into the category of a fibromyalgia patient, and especially now with the rest of her neurological workup being normal, that is the diagnosis I have given her."  (R. 293.)

On November 14, 2013, Plaintiff was seen again by Dr. Borders-Robinson for her generalized pain.  (R. 291-92.)  Dr. Borders-Robinson stated that she "feel[s] that [Plaintiff] has fibromyalgia . . ."  (R. 291.)  Plaintiff reported a pain score of 9 out of 10 "because of pain all over."  (R. 291.)  Dr. Borders-Robinson decided that Plaintiff would continue tramadol and would take gabapentin 300 mg at bedtime.  (R. 291-92.)

On November 25, 2014, Plaintiff was diagnosed with Raynaud's Syndrome[4] by Barbara Malat, C.N.P.  (R. 289-90.)  Plaintiff was "encouraged her to be very, very

---

[4]     Raynaud's Syndrome involves "idiopathic paroxysmal bilateral cyanosis of the digits due to arterial and arteriolar contraction."  STEDMAN'S MEDICAL DICTIONARY, 1911 (28th ed. 2006).

cautious to avoid over exposure to cold of her extremities" and was given a handout on Raynaud's Syndrome. (R. 289.)

On January 20, 2014, Plaintiff followed up with Dr. Borders-Robinson regarding medication for her fibromyalgia. (R. 287-88.) Dr. Borders-Robinson noted that the gabapentin was causing an increase in headache, dizziness, and lightheadedness, so she discontinued gabapentin. (R. 287-88.) The tramadol had been helping with pain. (R. 287.) Dr. Borders-Robinson started Plaintiff on Cymbalta 30 mg daily. (R. 288.)

On February 25, 2014, Plaintiff again met with Dr. Borders-Robinson regarding medication for her fibromyalgia. (R. 285-86.) Dr. Borders-Robinson noted that Plaintiff was originally on a 30 mg dose of Cymbalta[5] daily, but it increased to 60 mg and Plaintiff had found it to be successful in helping her generalized body pain. (R. 285.) However, Plaintiff claimed that the effects of Cymbalta wore off in early afternoon. (R. 285.) Plaintiff was not having any side effects with the Cymbalta at that time. (R. 285.) Dr. Borders-Robinson doubled her dose of Cymbalta to 60 mg twice daily. (R. 286.)

On April 8, 2014, Plaintiff had a wellness exam with Dr. Khouri. (R. 280-84.) At the exam, Plaintiff noted that she was not having any pain. (R. 280.) The notes regarding her musculoskeletal exam read: "Adequately aligned spine. ROM intact in spine and extremities. No joint erythema or tenderness. Normal muscular development.

---

[5]     Cymbalta is a serotonin-norepinephrine reuptake inhibitor ("SNRI"), generally prescribed for major depressive disorder, generalized anxiety disorder, fibromyalgia, chronic musculoskeletal pain, including low back pain and osteoarthritis, and the management of pain related to diabetes. THE PILL BOOK, 1204 (15th ed. 2012).

Normal gait." (R. 283.) Regarding her back: "Examination of the spine reveals normal gait and posture, no spinal deformity, symmetry of spinal muscles, without tenderness, decreased range of motion or muscular spasm." (R. 280.)

On July 7, 2014, Plaintiff saw Katie Ranvek, C.N.P. about her fibromyalgia medication. (R. 276-77.) NP Ranvek noted that Plaintiff had recently had her Cymbalta dose increased to 60 mg twice a day from once a day, which resolved her fatigue, pain, and loss of interest, but she started to develop tremors. (R. 276.) NP Ranvek noted that Plaintiff "is a healthy-appearing, alert, happy 49-year-old female in no acute distress." (R. 276.) Plaintiff next saw Dr. Borders-Robinson on August 25, 2014 regarding her fibromyalgia symptoms. (R. 274-75.) Regarding the increased dosage of Cymbalta, Dr. Borders-Robinson stated that Plaintiff "did quite well in terms of her pain, but unfortunately it caused tremor in her hands." (R. 274.) Plaintiff had also been taking up to 6 pills a day of tramadol. (R. 274.) Dr. Borders-Robinson suggested to Plaintiff that "the tremors were probably because of the combination of the increase in her Cymbalta and in combination with the tramadol." (R. 274.) Dr. Borders-Robinson altered the dose of Cymbalta to 90 mg daily and kept the tramadol dose at no more than 6 pills daily. (R. 275.)

On February 26, 2015, Plaintiff saw Theresa Russell, C.N.P. for a follow-up regarding her fibromyalgia symptoms. (R. 269.) Plaintiff reported to NP Russell that the pain in her legs, arms, and back was an 8 out of 10 and that she has occasional pain to her neck that goes down to her back near the lumbar area. (R. 269.) Plaintiff was taking tramadol for these symptoms. (R. 269.) Plaintiff took no greater than six pills per day,

but sometimes took less depending on her pain. (R. 270.) She further reported occasional lightheadedness, but she had not had any falls or numbness except some numbness in fingers "when she sleep[s] the wrong way." (R. 269.)

On July 23, 2015, Plaintiff saw Karen DeLacey, PA-C after three days of a new onset of bilateral extremity edema. (R. 347-48.) Plaintiff reported discomfort up to the level of her knees, but had no headaches, lightheadedness, chest pain, pressure, or palpitation. (R. 347.) PA DeLacey prescribed lisinopril 20 mg a day and a week of hydrochlorothiazide 12.5 MG to take in the morning. (R. 348.)

Plaintiff next saw NP Russell on August 18, 2015 due to generalized pain that she rated 10 out of 10. (R. 355-57.) Plaintiff also complained of a new onset of dizziness and occasional nausea starting 2-3 weeks prior to the visit. (R. 355.) Plaintiff noted "pain to the joints of her bilateral knees, right greater than left, toes, ankles," which made it "difficult to bear weight because of the pain." (R. 355.) NP Russell stated that it was unclear whether the issues were "associated with some dehydration or the side effects from restarting lisinopril." (R. 355.) NP Russell recommended continuation of the tramadol and Cymbalta for pain, Excedrin Migraine for headaches as needed, and that she consult rehabilitation services (physical therapy) for vestibular rehabilitation for positional vertigo and consult her primary care physician regarding the bilateral lower extremity joint pain. (R. 357.)

Plaintiff's evaluation with rehabilitation services occurred on August 26, 2015 where she was seen by Gretchen Young, L.P.T. (R. 358-60.) At the visit, it was noted that Plaintiff was "ambulating from waiting room into treatment room without assistive

device, no deviation to left or right.  However, base of support is lightly widened and pace is slightly slowed with mild guarding of cervical spine noted."  (R. 358.)  Her range of motion was generally within normal limits, but there was "audible clicking with patient having reproduction of pain in right ear and frontal head pain with performance of small flexion and extension motions (pitch movement of head) with performance of gaze stabilization exercises so these."  (R. 358.)  Regarding balance, Plaintiff was "able to maintain balance of 30 seconds in all 4 positions but significant sway with position 2 and 4 with feeling of dizziness and patient complaining of legs 'shaking.'"  (R. 359.)  PT Young stated that Plaintiff's subjective history is consistent with benign paroxysmal[6] positional vertigo.  PT Young assessed:

> Patient is demonstrating gaze hold left beating nystagmus; however, positional testing was negative today.  Alar ligament and transfer ligament tests were negative.  Modified vertebral basilar insufficiency test was performed in sitting position.  Patient having no reproduction of dizziness, however, in position of cervical protraction with cervical spine rotated to right and patient counting backwards from 15, patient paused between count of "6" and "5", and reported that she lost track whether she was counting down or up.

(R. 359.)  PT Young recommended a treatment of home exercises for upper cervical stabilization exercises and gaze stabilization exercises.  (R. 360.)  Plaintiff had no episodes of vertigo between that visit and a September 2, 2015 visit with PT Young.  (R. 361.)  However, Plaintiff still had intermittent clicking in upper cervical spine with intermittent right ear pain.  (R. 361.)

---

[6]     Paroxysm is "[a] sudden onset of a symptom or disease, especially one with recurrent manifestations such as chills and rigor of malaria."  STEDMAN'S MEDICAL DICTIONARY, 1427 (28th ed. 2006).

Plaintiff had another visit with NP Russell on September 2, 2015. (R. 364-65.) At the appointment, Plaintiff had "appropriate active range of motion without initiation of pain" and her "gait [was] steady without use of ambulatory aid." (R. 365.) NP Russell ordered an MRI of Plaintiff's cervical spine because of the clicking and pain behind the right ear. (R. 365.) The MRI came back noting only the C6-C7 degenerative disc disease already found in her 2013 MRI. (*Compare* R. 378 *with* R. 263.)

On September 17, 2015, Plaintiff saw PA DeLacey after three weeks of "worsening in her chronic underlying pain that . . . affects both of her knees, elbows, shoulders, ankles, and hip." (R. 405.) "She notes it is worse if she has been sitting for a while. It seems to improve as she elevates her legs or she takes a hot bath. She notes it is present in the morning as well as throughout the day. She has not noticed any specific aggravating factors." (R. 405.) PA DeLacey ordered a few tests that Plaintiff had not recently had or never had including: "uric acid and Lyme serology as well as [a rapid plasma reagin test], which she has not previously had." (R. 406.)

Plaintiff underwent a regimen of weekly physical therapy from February 2016 into April 2016. (R. 505-25.) Plaintiff complained of right knee pain (R. 507, 509, 512, 515, 524), bilateral hip pain (R. 507, 509, 512, 521). Plaintiff appeared in no acute distress, her gait was noted as mildly antalgic, and she was a "little slow and stiff to rise from a seated position." (R. 505, 507, 509, 512, 515, 518, 522, 524.) Plaintiff did physical therapy at the visits and with a home exercise program. (R. 506, 508, 510, 513, 516, 519, 522, 525.) At her last visit, Plaintiff reported her hip pain had improved, but her right knee pain "continues to be the most aggravating factor." (R. 505.) The plan was "to

continue independently with her home exercise program and use of pain relieving modalities." (R. 506.)

On April 10, 2016, Plaintiff saw PA DeLacey regarding her hypertension. (R. 421-22.) At the visit Plaintiff "denie[d] recurrent headaches, lightheadedness, dizziness, chest pain, pressure, palpitations, dyspnea." (R. 421.) She had suffered from issues with diarrhea likely due to an acute illness that had resolved. (R. 421.) Plaintiff had no other complaints besides some difficulties with constipation. (R. 421.) PA DeLacey obtained Plaintiff's potassium and creatinine levels and discussed her medications. (R. 422.)

Plaintiff again saw PA DeLacey on April 20, 2016 regarding her hypertension. (R. 466.) Her blood pressure readings were "ranging anywhere from 130 and 150 systolically and in the 80s diastolically." (R. 466.) Plaintiff had "been exercising on a daily basis 60 minutes doing yoga and anaerobic activity." (R. 460.) At the visit, Plaintiff complained of right knee pain. (R. 460.) PA DeLacey recommended Plaintiff continue her exercise regimen, continue watching her diet, and continue with physical therapy to assist with the knee pain. (R. 467.)

On August 17, 2016, Plaintiff saw NP Russell regarding fibromyalgia. (R. 423.) Plaintiff was still taking tramadol and Cymbalta for the pain. (R. 423.) Plaintiff complained that if "she walks outdoors 'the humidity is felt all through her body'; therefore, she is not able to tolerate being outside." (R. 423.) Plaintiff also complained of "foggy moments" a few times a week, such as "when she wakes up in the morning occasionally she is in a 'fog' and by noon she does not remember if she took some of her medications." (R. 423.) She rated her "generalized pain 8/10 and says this occurs every

day and she is not able to enjoy everyday life or unable to perform any activities because of her pain." (R. 423.) NP Russell continued Plaintiff's medications, but recommended using a pill planner daily. (R. 425.) NP Russell referred Plaintiff to a pain management clinic for pain relief due to fibromyalgia. (R. 425.)

At the pain management clinic, Plaintiff was seen by Samer Abdel-Aziz, M.D. on August 22, 2016. (R. 427.) Plaintiff reported "having pain in her bilateral shoulders, back, bilateral hips, bilateral knees and legs and bilateral ankles. The pain is non-radiating, constant, aching in nature, 8/10 in severity on average, worse with weather change and humidity. She also feels fatigued, wakes up in the morning unrefreshed and feels foggy, forgetting stuff frequently." (R. 427.) Plaintiff was noted as "alert and oriented and in no obvious distress." (R. 430.) Regarding her motor function, Plaintiff had "normal 5/5 strength in all tested muscle groups, no muscle. wasting or atrophy." (R. 430.) Dr. Abdel-Aziz advised Plaintiff "that exercise is the best treatment for fibromyalgia and encouraged to continue her regular exercise schedule[.] I also encouraged getting involved in yoga and stretching exercises." (R. 430.) Dr. Abdel-Aziz started Plaintiff on Pregabalin.[7]

Plaintiff followed up with Dr. Abdel-Aziz on October 17, 2016 regarding her pain. (R. 558.) Plaintiff reported a "50% improvement in her widespread pain since starting the Pregabalin." (R. 558.) "[S]he continues to have 'bad days' when she will have pain

---

[7] Pregabalin (brand name Lyrica) is an anticonvulsant and pain reliever prescribed for fibromyalgia, nerve pain associated with diabetes, pain after herpes zoster (shingles) infection, and partial onset seizures. THE PILL BOOK, 941 (15th ed. 2012).

in multiple joints specially the left hip and right knee, but her overall pain has improved. She continues to exercise daily." (R. 558.) Dr. Abdel-Aziz made no changes to Plaintiff's treatment. (R. 560-61.)

Plaintiff next saw Andrea Abcejo, M.D. on March 7, 2017 for an evaluation of acute low back pain. (R. 456.) Plaintiff reported that she was trying to fix a sink, laying supine, when it occurred. (R. 456.) Her pain was 4 out of 10 at rest and 10 out of 10 at worst, and made worse with lifting, bending, or stairs. (R. 456.) Her musculoskeletal examination found: "Lumbar spine nontender to palpation of spinous processes and paraspinal muscles. No tenderness to palpation of sacroiliac joints. Mild point tenderness to palpation of greater trochanters bilaterally. Range of motion of the lumbar spine is restricted by pain in all arcs." (R. 458.) Plaintiff also discussed bilateral hip tenderness with Dr. Abcejo. (R. 458.) Dr. Abcejo discussed "some exercises for stretching and strengthening of this area" and gave Plaintiff a handout. (R. 458.)

Plaintiff saw PA DeLacey regarding hypertension on April 11, 2017. (R. 543.) At that visit, Plaintiff noted "that she has been getting some low back pain." (R. 543.) "She notes that occasionally this will radiate down into the right posterior leg. She is having no weakness or paresthesias. No footdrop. She notes it started in January after she had been working on various things that she felt her muscles were getting pulled. She did some icing, had improvement in the pain and now in the last 2-3 weeks, it has occurred again." (R. 543.) In her examination, PA DeLacey noted: "L-spine, SI Joints, sciatic notches, femoral trochanters are all nontender to palpation. She has full active range of motion of the lumbar spine without difficulties. Straight leg lifts negative bilaterally.

Symmetric range of motion of her hips bilaterally without discomfort.  DTRs 2 /4 and equal bilaterally.  Motor strength 5/5 and equal bilaterally.  Sensation intact to touch in the lower extremities." (R. 545.)  PA DeLacey noted Plaintiff "is doing quite well" and "will continue with her medication." (R. 545.)  Plaintiff was referred to physical therapy. (R. 545.)

For the low back pain, Plaintiff underwent biweekly physical therapy in April and May 2017 for a total of ten visits.  (R. 477-504.)  Plaintiff presented in no apparent distress, but reported pain of seven out of ten and ten out of ten at its worst.  (R. 502.)  Plaintiff "demonstrate[d] slow transitions from sit to stand and ambulate[d] with mild antalgia with initial gait upon standing." (R. 502.)  Her subjective and objective findings were consistent with lumbar derangement.  (R. 503.)  The goal of physical therapy was to address "impaired range of motion, decreased core stability, faulty functional movement patterns and pain limiting function." (R. 503.)  Plaintiff reported right lower extremity pain (R. 492, 495, 498, 500, 502) or left lower extremity pain (R. 477, 480, 483, 486, 489, 502), but was otherwise pain free (R. 477, 483, 486, 489, 492, 495, 498, 500).

Plaintiff testified as to her alleged disability at the hearing before the ALJ on September 20, 2017.  (R. 31.)  Plaintiff testified that her doctor had recently increased her dose of pregabalin for fibromyalgia: "we upped it to 225 [mg] now and it is better." (R. 46.)  Plaintiff testified that she was no longer in physical therapy because her physical therapist "got it to the point where I was able to finish at home, where I got to where I could do everything she was doing for me at home for myself." (R. 49.)  She further testified that "standing is not good for long periods of time." (R. 51.)  She testified she is

17

able to stand for about fifteen minutes before she needs to sit and rest for five or ten minutes. (R. 51.) She also testified that if she sits for more than fifteen or twenty minutes, her legs start to get numb. (R. 52.)

### III. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.*

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v.*

*Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526–27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).

An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016) (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms). But the ALJ need not explicitly discuss each factor. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

## IV.   DISCUSSION

Plaintiff makes two challenges to the ALJ's determination. First, Plaintiff argues that the ALJ's RFC assessment fails to properly incorporate a sit/stand option, thereby failing to incorporate all limitations stemming from Plaintiff's severe impairments.

Second, Plaintiff argues that the ALJ failed to fully develop the record.  The Court

addresses each argument in turn.

## A.     The ALJ's RFC Determination Is Supported by Substantial Evidence

After considering the record, the ALJ found "that the claimant has the residual

functional capacity to perform light work as defined in 20 CFR 404.1567(b) with lifting,

carrying, pushing and pulling twenty pounds occasionally and ten pounds frequently,

standing six hours, walking six hours and sitting six hours in an eight hour work day,

except no more than occasional climbing of ramps and stairs, no more than occasional

balance, stoop, kneel, crouch and crawl, never climb ladders, ropes or scaffolds, no work

with exposure to unprotected heights or moving mechanical parts, no work in humidity

and wetness, and no work in extreme cold or heat."  (R. 14.)  The ALJ did "not include[]

further restrictions allowing for a sit/stand option as this is not supported by a treating

source or other evidence other than claimant's testimony."  (R. 18.)  Plaintiff's primary

challenge in this case is specific.  Plaintiff contends that the ALJ erred in not including a

sit/stand restriction because "the record contains Plaintiff's subjective complaints to her

medical providers and objective findings to support her complaints."  (Dkt. 15 at 12

(emphasis in original).)  For the reasons that follow, the Court concludes that the RFC

determined by the ALJ is supported by substantial evidence.

### 1.  Medical Evidence

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must

be supported by some medical evidence of the claimant's ability to function in the

workplace."  *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245

F.3d 700, 704 (8th Cir. 2001)).  But "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."  *Id.* (citing 20 C.F.R. §§ 416.927(e)(2), 416.946).  Here, the medical evidence supports the ALJ's finding that Plaintiff's RFC does not require the option to change positions from sitting to standing at will.

The only references to difficulty or pain sitting or standing are notes stating that prolonged sitting or prolonged standing are "aggravating factors" to Plaintiff's pain. (*See, e.g.*, R. 502, 509, 562.)  Prior to these physical therapy visits, Plaintiff had been seen for acute low back pain.  (R. 456.)  In any case, these references give no detail as to how frequently Plaintiff should be changing position, but Plaintiff's physical therapist told Plaintiff to "support lumbar spine with towel roll when required to sit for prolonged period."  (R. 503.)  Evidence that detracts from the ALJ's finding does not mandate reversal.  *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004) (The Eighth Circuit does "not reverse the Commissioner even if, sitting as finder of fact, we would have reached a contrary result; '[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150-51 (8th Cir. 1984))).  To the contrary, substantial medical evidence supports the ALJ's finding that a sit/stand option need not be part of Plaintiff's RFC.

At a 2014 wellness examination, examination of her "spine reveal[ed] normal gait and posture, no spinal deformity, symmetry of spinal muscles, without tenderness, decreased range of motion or muscular spasm."  (R. 283.)  Plaintiff had MRIs of her back

taken in 2013 and 2015, both of which only noted a C6-C7 degenerative disc disease. (R. 263, 378.) In 2013, Plaintiff's treating physician (Dr. Khouri) noted this as "ruling out spinal canal stenosis or any type of spinal cord abnormalities, and we looked and that is fine." (R. 293.) "There is some spurring within the cervical spine, but it is not impinging upon the spinal cord or nerve roots, and I do not feel that it is impacting at all her pain syndrome." (R. 293.) The 2015 MRI came back with nothing additional. (*Compare* R. 378 *with* R. 263.) In 2016, Dr. Abel-Aziz tested Plaintiff's motor function as having "normal 5/5 strength in all tested muscle groups, no muscle. wasting or atrophy." (R. 430.) In 2017, PA DeLacey tested Plaintiff while she was having low back pain and found: "L-spine, SI Joints, sciatic notches, femoral trochanters are all nontender to palpation. She has full active range of motion of the lumbar spine without difficulties." (R. 545.) At physical therapy for the low back pain, Plaintiff's complaints were of lower extremity pain, either right or left, rather than low back pain. (R. 477, 483, 486, 489, 492, 495, 498, 500.) Additionally, Dr. Phibbs noted no requirements to change positions in his August 2015 medical assessment. (R. 79-81.) In nearly all the visits with her treating providers, Plaintiff presented in no acute or apparent distress. (R. 276, 308-10, 502, 505, 507, 509, 512, 515, 518, 522, 524.) In sum, substantial medical evidence in the record supports the RFC.

### 2. Treatments

The conservative treatment directed by her treating providers and that medication controlled Plaintiff's pain also support the ALJ's findings. At numerous visits, Plaintiff was given medication for her impairments. (*See, e.g.*, R. 275, 288, 305, 325, 430.)

Plaintiff testified at the hearing before the ALJ that the pregabalin was helping with her fibromyalgia pain. (R. 46 ("[W]e upped it to 225 [mg] now and it is better.").) If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Hensley v. Colvin*, 829 F.3d 926, 933-34 (8th Cir. 2016) (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)). At other visits, Plaintiff's provider did not alter care (R. 291-92, 303, 322, 422, 423, 467, 560-61), ordered brief physical therapy (R. 357, 505-25, 545), or suggested some exercises that Plaintiff could complete (R. 312, 458). That a condition can be controlled with "routine, conservative medical treatment" weighs against finding it disabling. *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016). Here, no provider suggested that invasive treatment or care was necessary to control Plaintiff's impairments. Indeed, at the hearing, Plaintiff conceded that she no longer needed physical therapy sessions. (R. 49 ("She got it to the point where I was able to finish at home, where I got to where I could do everything she was doing for me at home for myself.").) The ALJ properly acknowledged that the course of and response to medical treatment support the RFC. (R. 16.)

### 3. Activities of Daily Living

The bulk of the evidence regarding the need for a sit/stand option came from Plaintiff's subjective testimony at the hearing before the ALJ. "Subjective complaints may be discounted if the claimant's testimony is inconsistent with the evidence as a whole." *Nash v. Commr., Soc. Sec. Administration*, 907 F.3d 1086, 1090 (8th Cir. 2018) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). Regarding activities of daily living, the ALJ noted:

> Claimant's daily activities are generally consistent with the residual functional capacity. Claimant testified that she can operate a motor vehicle once or twice a month but leg and joint pain interferes with it. She also gets tired when driving long distances. She visits with her adult children. On good days, she can walk about an hour. She performs some yoga and stretching. She vacuums, empties the dishwasher and washes laundry. She loads the dishwasher. She and her significant other go camping using a camper on weekends when they can. She tries to attend his grandson's T-Ball games when she can. She grocery shops. She goes to rummage sales. She and her boyfriend care for their dog. She has no problems with performance of personal cares such as bathing and dressing. She can pay bills, count change, handle a savings account and use a checkbook. (Ex. 4E). She had a flare up in back pain in January 2017 after lying supine under the sink trying to fix it. (Ex. 12F/10). She could help with tasks as needed. (Ex. 13F/ 11). She said she no longer gardens, sews, or makes crafts due to hand tremors. However, the hand tremors do not appear to be an ongoing problem.

(R. 17.) "Evidence of daily activities that are inconsistent with allegations of disabling pain may be considered in judging the credibility of such complaints." *Reece v. Colvin*, 834 F.3d 904, 910 (8th Cir. 2016) (citing *Dunahoo v. Apfel*, 241 F.3d 1033, 1038-39 (8th Cir. 2001)). Plaintiff's treatment notes include a 2014 annual physical reference to "exercising 5/week using the elliptical machine and yoga" (R. 280), a 2016 reference to "exercising on a daily basis 60 minutes doing yoga and anaerobic activity" (R. 465), a 2017 reference to "trying to fix a sink . . . laying supine under the sink cabinet" (R. 456). At the hearing, Plaintiff testified that she goes camping, goes to her grandson's T-ball games, and can travel although she says it is difficult to be in a bus seat overnight. (R. 59.) The ALJ properly weighed Plaintiff's activities of daily living and found them inconsistent with her allegations of disabling pain.

**B.    The ALJ Did Not Fail to Fully Develop the Record**

"[T]he ALJ has a duty to develop the record fully, fairly, and particularly when the claimant is not represented by counsel." *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988) (citing *Driggins v. Harris*, 657 F.2d 187, 188 (8th Cir. 1981) (per curiam)).  Where the claimant is represented by a lawyer, "it is of some relevance to [the court] that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).  In any case, "[a]bsent unfairness or prejudice this court will not remand for further proceedings." *Phelan*, 846 F.2d at 481.

Plaintiff complains that the ALJ relied on "an outdated medical opinion," of Dr. Phibbs from August 31, 2015, and should have "arranged for a consultative examination, scheduled a review of the record and testimony by a medical expert, or even sent the entire (and updated) case record back to the State Agency for evaluation by a medical consultant."  (Dkt. 15 at 16.)

The opinion of Dr. Phibbs encompasses nearly three years of medical record after the alleged onset date and the majority of the medical records.  Even if the ALJ could have ordered an additional consultative examination or review of the record, Plaintiff has failed to establish unfairness or prejudice resulting in the ALJ's alleged failure to develop the record.  *See Onstad*, 999 F.2d at 1234 ("In considering [the argument that the ALJ did not fully develop the record], our inquiry is whether [the plaintiff] was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand.").  Plaintiff has not pointed to any medical records that

occurred after Dr. Phibbs' opinion for which she was prejudiced by it not being considered. Instead Plaintiff points to three things: "(1) the nature of fibromyalgia, which can wax and wane over time, (2) the lack of any opinion from an examining physician, and (3) the 2-year gap between Dr. Phibbs' record review and the hearing, at which Plaintiff testified to a limited ability to sit, stand, and walk due to her severe impairments." (Dkt. 15 at 15.) Regarding (1), Plaintiff has not pointed to any specific medical records that show a decline in Plaintiff's functioning related to fibromyalgia that occurred after Dr. Phibbs' opinion. The ALJ reasonably found: "More recent medical records do not reflect a worsening of her condition, and if anything, show some improvement in her overall condition." (R. 18.) Regarding (2), "there is no requirement that an RFC finding be supported by a specific medical opinion," and "[i]n the absence of medical opinion evidence, 'medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013) and quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)). And (3), the ALJ has the authority to assess the credibility of Plaintiff's subjective complaints at the hearing and weigh the evidence. *See Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004) (citing *Benskin v. Bowen,* 830 F.2d 878, 882 (8th Cir. 1987)) ("Weighing the evidence is a function of the ALJ, the fact-finder."); *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003) (citing *Benskin*, 830 F.2d at 882) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); *see also Knight v. Berryhill*, 16-CV-

214-LTS, 2018 WL 3078109, at *7 (N.D. Iowa Feb. 15, 2018) (quoting *Mangrich v. Colvin*, No. C15-2002-LTS, 2016 WL 593621, at *8 (N.D. Iowa Feb. 12, 2016) (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011))) ("Although the state agency consultants did not have the opportunity to review all the treatment records before forming their opinions, 'there is always some time lapse between the [state agency] consultant[s'] report[s] and the ALJ's hearing and decision,' and '[t]he Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.'").  Here, there was no need for the ALJ to order additional examination of the Plaintiff.  Accordingly, the ALJ did not fail to fully develop the record.

## V.    ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.  Plaintiff Dorothy V.'s Motion for Summary Judgment (Dkt. 14) is **DENIED**;

2.  Defendant Commissioner of Social Security Andrew Saul's Cross Motion for Summary Judgment (Dkt. 17) is **GRANTED**; and

3.  This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: August 15, 2019                    *s/Elizabeth Cowan Wright*
                                          ELIZABETH COWAN WRIGHT
                                          United States Magistrate Judge